**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **CENT HOLDING COMPANY,** | : | |
| **LLC, and CENT CAPITAL, LLC,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Case 5:21-cv-00418-RDP** |
| | : | |
| | : | |
| **WOLFRAM RESEARCH, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## AMENDED COMPLAINT

AND NOW, COME Cent Holding Company, LLC, and Cent Capital, LLC ("Plaintiffs") and file the following Amended Complaint against the Defendant, Wolfram Research, Inc. ("Defendant"):

A Glossary of terms is provided as Appendix A.

### Introduction

1.    Plaintiffs provided Trade Secret and other confidential information to Defendant, including a unique combination of technical data and non-technical business information, namely software design documents, computer code, business development information, know-how and processes for implementing the business development information and related computer code, under a non-disclosure agreement and consulting contract. The non-disclosure agreement and consulting

contract required the conversion of the Trade Secret information into the Wolfram language and the development of a fully functional Application Programming Interface (API) connection that enables the integration and transformation of Bloomberg Limited Partnership's (LP) native elements, which are associated with all Fields and Properties within the Bloomberg namespace, thereby making them not only discoverable, but actionable.

2. Defendant partially completed the contracted project, which included the development of specific intellectual property to implement the functionality required by Cent. Thereafter, Defendant held at least three (3) webinars, as part of a series of webinars, during which it disseminated/released/disclosed Plaintiffs' converted Trade Secret and proprietary information, some of which exactly matched and was disclosed verbatim, to webinar attendees consisting of over 400 of Plaintiffs' potential customers and competitors. This disclosure included numerous Trade Secrets that correspond directly to Cent's claims, such as proprietary code that Plaintiffs provided to Defendant, along with the enhanced capabilities of the fully functional Desktop API connection. As confirmed by CellIDs, substantial portions of Cent's private Notebook, including specific code segments which belong to Cent, were included in Defendant's Notebook, which was made publicly available on or after a webinar presented on January 27, 2021. Defendants advertised those Trade Secrets and claimed them as their own. These actions are in violation of the non-

disclosure agreement between the parties, their consulting contract which is still in effect, and the applicable Trade Secrets statutes. Defendant's actions turned the parties, and the third parties to which the Defendant disclosed Plaintiffs' Trade Secrets, into direct business competitors. As a result, Plaintiffs have suffered and continue to suffer irreparable harm with damages that cannot be adequately measured in monetary terms.

3. Multiple elements of Plaintiffs' Trade Secret information improperly disclosed by Defendant were not public, and thus not available to Defendant prior to Plaintiffs provided that Trade Secret information to Defendant as part of their consulting agreement. Even if some aspects or portions of the relevant information were publicly available (i.e. native elements within Bloomberg's namespace or Bloomberg documentation), the technical ability to combine and integrate the native elements of this namespace in a useful manner within the Wolfram Language is, itself, Trade Secret information. Thus, while many of the individual elements of Plaintiffs' Trade Secrets are existing, the manner in which Plaintiffs combined and used them is novel. For example, the manner in which Cent combines real-time and historical data analysis across an entire market using multiple data sources for the purposes of constructing dynamic trading portfolios is novel.

4. More specifically, Plaintiffs possessed, and provided under contract, unique technical resources to Defendant regarding pivotal integration requirements

which are necessary to harness Bloomberg's namespace in an actionable (useable by the end user) manner. Furthermore, ALL of the aforementioned elements relevant to the Plaintiff's unique Trade Secrets were provided to the Defendant in furtherance of their contractual relationship and are protected by a non-disclosure agreement that Defendant ignored.

5.     Further, Plaintiffs' Trade Secret and confidential information, which is the subject of this Complaint, is proprietary, designed and developed by Plaintiffs prior to, or during, their contractual relationship with Defendant.

6.     Upon information and belief, Defendant misappropriated Plaintiffs' Trade Secrets to resolve Defendant's own technical deficiencies relative to Defendant's use of outdated code, technologies, and financial data providers. These deficiencies impacted Defendant's ability to process and share data from Bloomberg and other financial data providers that supported Defendant's customers who used Defendant's line of products, including Mathematica and the Wolfram Finance Platform.  These technical deficiencies seem to be centrally focused on pervasive and persistent issues in providing reliable access to financial market data to Defendant's users.  In short, Plaintiffs figured out how to use the Bloomberg data in a commercially more useful way than Defendant had been able to develop on its own, so Defendant simply "took" Plaintiffs' ideas as its own to solve Defendant's existing deficiencies.  Until it misappropriated Plaintiffs' Trade Secrets, Defendant

did not know how to maximize information from the useful data contained in the Bloomberg stream for commercial use. Plaintiff did know how and supplied that information to Defendant under their agreements. Whereupon, Defendant stole that knowledge and has endeavored to pass that knowledge and capability off as its own creation.

7.      Upon information and belief, Defendant faced seemingly unresolvable issues providing financial data to its customers via *FinancialData[]* functions, a deficiency that Defendant was only able to overcome when Plaintiffs provided the Trade Secrets to Defendant. Within a year of Plaintiffs contracting with Defendant, Arnoud Buzing, the head of Wolfram Technology Group publicly acknowledged that *"FinancialData, FinancialIndicator, TradingChart and associated WolframAlpha Entity ["Financial",..] functionality that access market data for free have been affected by the reconfiguration of our financial data providers… We will bring this functionality back online if and when it becomes viable to do so."*

8.      Additionally, third-party users of Defendant's products expressed their frustrations on these particular data services being discontinued in August 2019 with comments ranging from *"For me, FinancialData[] was the primary benefit of moving to version 12. Most of my development work during the last 6 months is now inoperable"* to *"I must say that I am disappointed with the misleading advertising of its capabilities as far as FinancialData…I find the reply by Arnoud that*

*Mathematica will bring this functionality back online if and when it becomes viable to do so. As really off putting. Dear Arnoud- is it viable to have a help section that misleads people?"*

9.    Furthermore, users on Defendant's own community forum even state that *"Nothing in WL is real-time. I was just giving an example of how astronomical data cost are…The example I gave regarding non-display is a recent example where monthly cost went up 5x overnight. It started with NYSE and now all exchanges are following suit. The environment has rapidly changed and it's unreasonable to expect WRI or anyone to provide any kind of trade data without the specific intent to directly monetize it."* and, *"All my calculations useless…The Financial data functionality in Mathematica is essentially useless, and it has been useless for months….I am sorry, but you cannot advertise a functionality, charge for it and then claim it is hard to provide it, that it is expensive, etc. Mathematica is expensive!! Either provide advertised functionality, or remove it and refund those who purchased it under false pretense that the manual for 12.0 describes actual abilities and not imaginary ones."*

10.    Simply stated, Defendant misappropriated Plaintiffs' Trade Secrets and other confidential information after contracting with Plaintiffs. The main benefit gained by Defendant in doing so is that Cent's Trade Secrets mitigate a number of operational risks/costs that Defendant had to contend with prior to contracting with Cent and subsequently stealing Cent's ideas learned pursuant to those contracts.

Specifically, Defendant no longer needed to be concerned with contracting other data service providers for products provided via its platform. Furthermore, Defendant, after taking Cent's intellectual property, never again needed to enter the market to change financial data providers and face the variable (and unpredictable) cost of doing so. Defendant knew it could provide Cent's Trade Secrets to current (and attract new) users of the Wolfram Language, and seemingly resolve all data feed issues in perpetuity. By misappropriating Cent's Trade Secrets, Defendant avoided having to invent or acquire a complete data infrastructure *"reconfiguration"* that, itself, still would present a systemic risk of data loss in the future. Defendant's own infrastructure was not able to satisfy Cent's needs when Cent initially sought a relationship with Defendant. Cent went about figuring out a way to take Defendant's existing mechanisms and technologies and combine and integrate them in a new way, such that they could be used to yield novel insights into trading algorithms and mechanisms. Defendant, taking Cent's novel use of its technology without Cent's permission, went ahead and disclosed Cent's Trade Secrets to several hundred persons.

11.     Based on this misappropriation, Defendant users who purchase a Bloomberg Terminal license may now fully integrate the best financial data supply chain in the world, with the best symbolic software language, thus creating the best computational environment possible for quantitative finance professionals. The

benefits, financially and otherwise to Defendant are incalculable, but the benefits come solely at Plaintiffs' expense and that of their customers, investors, and stakeholders. It irradicates years' worth of Plaintiffs' work developing Plaintiffs' unique and proprietary Trade Secrets. Plaintiffs showed Defendant how to do something that Defendant on its own previously could not do. That "something" is a means to use existing available Bloomberg data in "real time" and with exponentially more individual data points to provide information to customers for use in buying and selling securities. Cent's Trade Secrets, misappropriated by Defendant, constitute a revolutionary leap forward in creating the ability for investors (and those advising investors) to make fully informed decisions constantly during a trading day on virtually any publicly traded security. The monetary value of this ability developed by Cent, and unlawfully taken and disseminated by Defendant, is an amount beyond calculation. Cent's process not only improves on, it re-invents the existing analytical tools available in the marketplace for professionals in the field of investing. These professionals include persons or companies that commercially advise customers in the buying and selling of securities, and sophisticated individuals buying and selling on their own account. Defendant misappropriated and disclosed Plaintiffs' revolutionary ideas -- ideas that transform forever the ability for people to commercially analyze available financial data and make informed decisions in the buying and selling of securities. Defendant

did so while under contract with Plaintiff to develop Plaintiffs' ideas and not disclose Plaintiffs' proprietary information.

## Parties

12.     Plaintiff Cent Holding Company, LLC ("Cent Holding" or "Cent"), is a limited liability company formed under the laws of the State of Delaware. All of Plaintiff's members are residents and citizens of the State of Alabama.

13.     Plaintiff Cent Capital, LLC ("Cent Capital"), is a limited liability company formed under the laws of the State of Delaware. All of Plaintiff's members are residents and citizens of the State of Alabama.

14.     Defendant Wolfram Research, Inc. ("Wolfram"), is a business corporation formed under the laws of the State of Illinois and with its principal place of business in the State of Illinois.

## Jurisdiction and Venue

15.     Under 28 U.S.C. § 1332, jurisdiction is proper in this Court because this is a civil action between citizens of different States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.     Plaintiffs are citizens of the State of Alabama.

17.     Defendant is a citizen the State of Illinois.

18.     Venue is proper in this Court because (1) Plaintiff is a resident of this district and division, with its principal place of business located in Huntsville,

Alabama, (2) a substantial part of the events or omissions giving rise to Plaintiffs'
claims occurred in Huntsville, Alabama, and (3) Defendant is subject to personal
jurisdiction in this district.

## Facts

19.     Plaintiff Cent Holding is an innovation company that utilizes Artificial
Intelligence, Machine Learning, and Behavioral Economics to enhance knowledge
and perspective in the world in order to assist in decision-making especially relative
to investment decisions and financial markets. Plaintiff Cent Holding is the holding
company for a family of companies started in 2019. Plaintiff Cent Holding owns
100% of Plaintiff Cent Capital, which is a start-up hedge fund company formed in
the year 2020, and holds both Federal and State approvals as a Registered Investment
Advisor.

20.     This approval represents the completion of three separate securities
related regulatory exams, all of which are required before starting a registered hedge
fund/investment management firm. This status also allows Cent Capital, by law, to
manage funds in excess of $25,000,000 each for more than fifteen clients and
eliminates major regulatory constraints that apply to unregistered and unapproved
entities. Being a Registered Investment Advisor legally allows Cent Capital the
latitude to grow in scale relative to other competing industry leaders such as, for
example, Renaissance Technologies, LLC, and Two Sigma Investments, LP.

21.     Additionally, although Plaintiff Cent Capital has not yet started their full operations, it has received substantial commitments from investors that would allow Cent Capital to have at least $200,000,000 in assets under management upon commencing full operations, which are being unduly delayed due to the present dispute since Cent lacks exclusive use of the process it developed under contract with Defendant that Defendant has taken and distributed as its own.

22.     Separately, and independent of the management of funds, Plaintiff Cent Capital has already received financial investments for building its business. The use and disclosure of much of Plaintiffs' Trade Secret information by Defendant has undermined the viability of Plaintiffs' business and impacted their business model. As a result, Plaintiffs are in a significantly compromised position in continuing to attract investment capital for their business.  That Cent had a unique ability to analyze Bloomberg data was a major "selling point" to potential investors. Defendant's actions that are the subject of this complaint have damaged Cent's greatest marketing asset in seeking investors.

23.     Defendant holds itself out as one of world's most respected computer, web, and cloud software companies, as well as a powerhouse of scientific and technical innovation. Defendant is the developer (and seller) of computer languages that provide the framework for powerful computing—making it possible to compute whatever can be computed.

24.     Defendant's computer languages are root or compiling languages involving symbolic mathematical computation programs. These languages are used by various Wolfram customers in scientific, engineering, mathematical, and computing fields as a basic underlying platform upon which the customers may use their own proprietary technology, in their effort to access data for manipulation and analysis.

25.     Since certain aspects of Defendant's technology is focused on facilitating access to database systems, Defendant is not focused on a clients' underlying businesses and its clients' related technology. Accordingly, Defendant by its own admission in its template terms and conditions, does not seek ownership in its customers' underlying software, and/or any intellectual property associated with its customers' businesses.

26.     Plaintiff Cent Holding has developed proprietary technology which is licensed to Cent Capital for operations. The "competitive advantage" upon which Plaintiff Cent Holding allowed Cent Capital to be founded is the use of its unique and proprietary technology (unprecedented in the industry) to manage investments. The success of any hedge fund depends on its ability to identify and take advantage of potentially profitable opportunities while also seeking and implementing limits to risk.

27. Historically, the hedge-fund industry has used Microsoft Excel (a computer spreadsheet program) as its computational environment. Within the industry users consider Microsoft Excel slow, cumbersome, and only suited for use computing relatively small amounts of data -- less than 10,000 data points or "cells." For example, if required to consider market data at a one second refresh rate like Cent's process enables users to do, then Excel would crash after processing roughly 42% of the data during a 6.5-hour trading day. Excel is the current industry standard. If asked to perform calculations as rapidly as Cent's process, misappropriated by Defendant and the subject of this litigation, Excel would crash every time.

28. Most participants in the hedge-fund industry rely on market data provided from a "Bloomberg Terminal." According to Bloomberg, there are approximately 325,000 terminals around the world, connecting market participants to Bloomberg's groundbreaking data, analytics, and information-delivery service. The Bloomberg Terminal provides historic data, real-time market data, and reference data, without the information a Bloomberg Terminal provides allowing for informed decision making, a hedge fund could not successfully operate.

29. Access to data from a Bloomberg Terminal is very common for a hedge fund. However, what is critical to a hedge fund's success is what it does with the information access to a Bloomberg Terminal allows. A hedge fund's ability to process, analyze, and use that data to make actionable and profitable investment

decisions will dictate the success or failure of that hedge fund. Each hedge fund adopts its own process for taking the information that is available from the Bloomberg Terminal and uses that process to make calculations ultimately for use in how to manage its clients' funds. Historically, many in the industry have relied on Microsoft Excel as the underlying software platform to execute these calculation functions.

30.    In the hedge fund business, any tool that can be used dependably to identify actionable opportunities in order to minimize risk is a valuable tool to the fund in making decisions in the management of its clients' portfolios.

31.    If a hedge fund were to have such a tool that dependably identified actionable opportunities, that minimized risk, that proved itself to be consistently profitable under market conditions and was proprietary (meaning not available to competitors), then such a tool would be valuable virtually beyond measure. Plaintiff Cent Holding spent over a year working to develop exactly such a tool—a tool named "Tabula Rasa[1]," developed utilizing Plaintiffs' Trade Secret and confidential information.

32.    Utilizing the new fully functional Bloomberg Desktop API connection developed by Plaintiffs under contract with Defendant, Tabula Rasa allows a user to

---

[1] *Tabula rasa* means "clean slate" in Latin, named so because of its unprecedented nature.

take a large amount of real-time market data to analyze and react to market opportunities (across multiple market sectors) faster than any competitors' existing processes. Cent's design allows for analysis at a minimum of all 500 securities in the S&P500 at 1 second resolution, for an entire trading day on 500 distinct parallel computational kernels. To understand this more fully, consider that merely analyzing just the price of these 500 securities involves computing up to 11.7 million data points, but in reality, to reach the number of unique analytical data points that incorporate into Tabula Rasa, one must multiply 11.7 million by (n) number of factors including, without limitation, volume, bid, ask, and hundreds more. Tabula Rasa also allows the user to "beat the market." Plaintiffs developed this novel approach, in combination with meta-portfolio construction and analysis, with the specific intent of enabling Cent Capital to beat their competitors and become the industry leader worldwide.

33.      With Tabula Rasa, Cent Holding developed a holistic computational environment (which is part of Plaintiffs' Trade Secret and confidential information) that is far superior to Microsoft Excel. Tabula Rasa is faster, handles vastly more data, and is simply more powerful and more dependable. Beyond that, no one in the industry (other than Plaintiffs) has it. Tabula Rasa is both better than anything in the industry, and proprietary to Plaintiffs in that Plaintiffs developed Tabula Rasa by

identifying what needed to be done to combine existing mechanisms and technologies in a new way that could be used to gain economic advantage.

34. Tabula Rasa is a proprietary risk analysis platform developed by Cent which can be used to do analysis in domains such as credit and investment risk. Examples of Trade Secret and confidential information regarding investment risk are defined in Cent Capital's Project Plan and Design Documents. ***See* Exhibits 01 and 02 attached hereto**. The Trade Secret(s) behind Tabula Rasa are composed of three distinct categories where the corresponding components contain Cent's internally designed and developed documentation, design, and code. The three categories are not only interrelated, they are interdependent, meaning each categorical capability is not useful/actionable without the others (i.e. a three-legged stool). The categorical components are as follows: infrastructure components, architecture components, and algorithm & analysis components. The infrastructure components and architecture components do not contain algorithms or analysis (i.e. logical and mathematical functions/formulae used to make actionable decisions).

35. Cent's infrastructure components include a unique combination of the mechanisms and ingestion of data from a Bloomberg Terminal Desktop API (with the appropriate data license) for correct use in Defendant's products, as implemented by Defendant to meet Cent's requirements, including the correct formatting of information so that it could be used in Mathematica for manipulating and visualizing

real-time streaming data from Bloomberg. Cent developed the infrastructure components utilizing the research and exploratory work performed by Cent in order to use the existing Wolfram Language. Cent also identified the technical deficiencies in the current data ingestion mechanisms used by Defendant. As part of this process, 400+ lines of code were developed to map the input data from Cent's Bloomberg Desktop license into the format required by Mathematica. The combination of Cent's requirements for the mechanisms and ingestion of data from a Bloomberg Terminal Desktop API (with the appropriate data license) for correct use in Defendant's products, along with the research and code developed by Defendant to satisfy those requirements in accordance with the parties' contractual relationship, is therefore a concrete example of Cent's intellectual property and trade secret information. In short, the method of data integration from Bloomberg and the transformation thereof is Plaintiffs' Trade Secret. The nature of the infrastructure components as a trade secret is further evidenced by a unique combination of the following items:

a.      Fully Functional Bloomberg Terminal Desktop API connection with Wolfram Finance Platform allowing for full Mnemonic Integration and Reliable Concurrent Sessions.

b.      Useable Service Connect Function to Trade Secret 1.

c.      Optimal Bloomberg Integration

d.     63,000+ Mnemonic Fields and Properties which can be queried on demand from Bloomberg Data Center via Bloomberg Terminal Desktop API.

e.     *"ReferenceData"* Functionality

f.     *"OPT_CHAIN"* Property

g.     Instruments or Instrument Functionality

h.     Index Information

36.     Cent's architecture components include the applied parallel implementation of real-time and historical data analysis in a dynamic network of computational kernels configured with a custom list of financial instruments/securities, and then combining that parallel, real-time analysis in order to construct meta-portfolios, as part of an algorithmic trading strategy for securities. Cent authored and shared documents with Defendant regarding the need to support large-scale computational parallelization which rely upon Cent's intellectual property and trade secret information. This is specifically found in the Cent Capital Project Plan document sent on 12/03/2020, which states, "*Phase 2: Back-end functionality being triggered by front-end parametrization and analysis (that is selected for by the user -- potentially automated for) in the GUI designed and implemented in Phase 1. We intend to collect and apply the parameters to each container in our Kubernetes environment -- one container for every security in the*

*SP500 -- to allow for parallel analysis."* The nature of the architecture components as a trade secret is further evidenced by a unique combination of the following items:

a.      Computational Kernel Architecture and Data Processes

b.      Hardware Integration, Utilization, and Optimization

c.      Distributed Analytics

d.      Parallel Computation

e.      Distributed Cluster Network Management

f.      Interface Design and Manipulation

g.      Package Architecture Skeleton

h.      Data Workflow Design

37.      Cent's algorithm and analysis components include the combination of the properly formatted real-time data feed with the information about a set of options-based securities with the parallel real-time data analytics to construct meta-portfolios as part of an algorithmic trading strategy for options and other tradable instruments. Cent authored and shared documents with Defendant regarding the use of parallel computational kernels combined with the Bloomberg Terminal Desktop API data feed which rely upon Cent's intellectual property and trade secret information. The nature of the analysis component as a trade secret is further evidenced by a unique combination of the following items:

a.      Portfolio Optimization

b.      Conic Optimization

c.      Convex Optimization

d.      Quadratic Optimization

e.      Second Order Cone Optimization

f.      Constraint Optimization

g.      Asset Class/Allocation Optimization

h.      Dynamic Portfolio Allocation and Trading Optimization

i.      Select Interval for Data Slicing into Bar Intervals for all Fields and Properties

j.      Select Interval for Data Grouping of Bar Intervals for all Fields and Properties

38.     The algorithm & analysis components category contain two distinct parts. One part includes Cent's core algorithm(s), while the other includes the analysis configuration components. These combined parts shall be referred to herein as the algorithm & analysis configuration components, which are a part of Cent's overall Trade Secret(s).

39.     The analysis configuration components allow for data to be selected, customized, manipulated, distributed, aggregated, ranked, sorted, and visualized so that a user can systematically generate a variety of actionable and proprietary

technical market/trading indicators, thereby configuring the analytical framework of which the algorithm components operate on.

40.     Cent's algorithm(s) have proprietary selection criteria which include a requirement of configuring multiple variables and hyper-parameters that become dynamic when deployed in parallel across computational kernels, leading to a constant state of change in the optimal configuration through time. A disclosed example of the capabilities associated with analysis configuration components include the ability to select the bar intervals for the market data corresponding to a specific financial security (i.e. stock, option, ETF, etc.).

41.     This method is applied to both the historic and the real-time data and allows the selected bar intervals to be grouped into congruent sets based on a user-defined size for each financial security and its corresponding factors. The specified interval and group parameters are deployed concurrently and asynchronously on computational kernels, which are designated specifically for each financial security being analyzed in parallel.

42.     Defendant's disclosure of the analysis configuration components is extremely detrimental to maintaining the secrecy of Tabula Rasa's overall proprietary computational design/methodology, and at a minimum gives Cent's hedge fund competitors insight as to how the algorithmic components of Tabula Rasa might be constructed and could enable said competitors to "reverse-engineer"

Tabula Rasa's algorithms which presently are known only to Cent and form the core of what differentiates Cent from other hedge funds.

43.     A computational kernel might be personified as a single individual risk analyst whose only responsibility is to track and analyze data for one corresponding security. Master kernels might be personified as an "individual portfolio manager" whose responsibility is to derive portfolios from the analysis and data supplied via the aforementioned individual risk analysts.  This structure is vital for the risk analysts and the portfolio managers to automate meta-portfolio construction and optimization into an aggregated process which occurs at a one second resolution for multiple unique portfolio strategies (*i.e.*, Master Kernel 1 – Equity Long/Short Strategy, Master Kernel 2 – Event-Driven Risk Arbitrage, etc.).

44.     Under this configuration, each risk analyst only generates one report which can be collectively combined and distributed to each portfolio manager for their respective model specific evaluation and implementation. This novel computational approach to investment management creates synergies allowing for highly efficient real-time data analysis leading to actionable decisions and first-mover advantages in the market.

45.     Therefore, the analysis components' functional intent is to implement specific techniques in meta-portfolio construction and optimization derived from the output of the first-order evaluation being conducted for each security and decision

filtered on each kernel. This configuration allows Cent Capital to facilitate and apply multiple trading strategies within the same computational infrastructure (i.e. Pure Signal and Optimal Telemetry). A description of these strategies can be found on Cent Capital's Form ADV Part 2 which is on file with the SEC:

"*The TR Program will be used to implement what we believe to be an industry first dynamic sector and strategy rotation investment methodology which we call PURE SIGNAL. This holistic strategy implements aspects of other strategies like Absolute Return, Tactical Rotation, and Risk Arbitrage Strategies across multiple sectors and asset classes to generate returns by exploiting mis-pricing and inefficiencies in global capital, equities, derivatives, commodities, and currency markets while attempting to reduce systematic risk exposure found in traditionally constructed investment portfolios which are caused by primary market forces (e.g. equity market volatility and interest rate subjectivity) through various hedging/risk mitigation techniques. These type strategies have historically delivered returns that are less correlated with equity and fixed income markets than traditional investment strategies.*

*Pure Signal is the result of applying the proprietary dynamic risk analysis model Tabula Rasa to financial markets. The strategy is*

*designed to calculate the lifetime economic utility value of a given risk-based decision per unit of cost relative to all other risk and their rotation through their economic/impact life cycle. It is systematic in its ability to model the value of risk in relationship to all other "quantifiable" risk, a process we call "Dynamic Cost Adjusted Intrinsic Value Analysis." Stated more simply, it models numerous risk factors including consumer behavior and their multivariate elasticity to data and establishes risk grades by the holistic evaluation of all input variables, such as market traded investment vehicles and asset class/risk positions. By viewing portfolio allocation as a pure mathematical equation rather than crystalized categorical construction, we can read the implicit signals the data is giving us and position ourselves ahead of the noise. Thereby, increasing the frequency and strength of positive investment risk and parsing out fields of static unattractive risk.*"

46.     With Tabula Rasa, the actionable utilization of technical market/trading indicators and proprietary algorithm(s) for traders, hedge funds, and investment firms, and their own related high-speed trading systems based on pre-determined market conditions, allows organizations and individuals to make rapid investment decisions in real-time at a level far beyond what was available using conventional

Wolfram technology that Defendant possessed and was using prior to contracting with Plaintiffs.

47.     Notably, it is only due to the Trade Secrets developed by the Plaintiffs, namely the infrastructure and architecture components, that a party can utilize its respective technical market indicators and proprietary algorithm(s) at a one second resolution on ALL native Bloomberg Terminal elements in an actionable manner that can be leveraged for analysis. This capability is not possible without the Plaintiff-developed fully functional integration to the Bloomberg Terminal Desktop API within the Wolfram Language. Only after contracting with Cent, and learning what Cent had developed, did Defendant understand how Cent could take the same data stream from Bloomberg and develop from it exponentially greater useful knowledge in real-time for use instantly in making investment decisions. Defendant understood that Cent's process for using the same Bloomberg data available to Defendant resulted in a vast improvement over anything Defendant could offer its customers. Thereafter, Defendant appropriated the product for itself, instead of performing on its contract with Cent to translate Cent's ideas into the Wolfram language, and then privately delivering to Cent the product resulting from that contract for commercial use by Cent as a hedge fund.

48.     The significant functional benefits of Cent's proprietary analytical platform, which contains Cent's Trade Secret information, are that Cent can obtain

and process data in actual, continuous, concurrent, real-time, and at an unprecedentedly high-speed. At least 63,600 pieces "Fields and Properties" of data can continuously be pulled/received in real time (intraday) concurrently on registered financial instruments traded on public exchanges around the world. Cent can also obtain the "historic" (intraday) values for these Fields and Properties as well, allowing for analysis of historic data in one second intervals.

49. Prior to contracting with Plaintiffs, the conventional Wolfram technologies utilized an older version of an API connection, as well as a code package and structure known as "*BloombergLink,*" which Defendant marketed as the core value-add capability of the Wolfram Finance Platform. Despite the name, "*BloombergLink*" is not a Bloomberg product. It is a product created by Defendant that Defendant, confusingly, calls "*BloombergLink.*" Bloomberg, itself, does not list "*BloombergLink*" as a product offered by Bloomberg among the company's product offerings.

50. Defendant allegedly worked with Bloomberg developers through a Restricted Developers License, or a free Software Developer Kit (SDK) available to anyone, and possibly the Enterprise Data License to develop the "*BloombergLink*" code functionality hoping to provide data feed services to a variety of Wolfram Finance Platform users.

51.     In order for a user to gain access to an SDK specifically for the Bloomberg Terminal Desktop application, the user must already have a Bloomberg Terminal Professional License and sign in via the same username and password used to sign into the desktop application. The free SDK, publicly available to anyone, is substantially different on a technical level, and acutely includes an entirely different file structure and user authentication technique which directly correspond to the varying Bloomberg API integrations and downstream data availability and functionality. Dr. Michael Kelly, a Wolfram employee who worked under the "Development Support" contractual agreement and a Wolfram employee who disclosed Cent's Trade Secrets, has significant statements on multiple recorded development sessions between Plaintiff and Defendant, which Defendant provided to Cent via Zoom, that are included throughout this Complaint. It is important to note that using Zoom as the preferred method of communication between the parties was established by the Defendant in the technical consulting Development Support contract. Specifically, under the terms and conditions of the contract that was effective as of December 4, 2020, *"All work will be performed from Contractor offices and all communications will be through e-mail, telephone, or **Zoom Sessions** unless the customer provides any alternative mode of communication."*

52.     These recordings substantiate the fact that (1) Trade Secret capabilities relevant to Plaintiffs' claims directly correspond to Plaintiffs' project development

sessions, (2) Defendant may be misrepresenting the extent to which they worked with Bloomberg Developers to produce the *"BloombergLink"* product offering and its corresponding functionality, and (3) substantiates questions as to the Defendant's ability to obtain, legitimately, the rights to develop and distribute a fully functional Bloomberg Terminal Desktop API integration with their "current," "highly-restricted" Bloomberg Developer's license.

53.     Importantly, Defendant never had access to a Bloomberg Terminal until Cent purchased one and afforded Defendant access to Cent's Bloomberg Terminal. Previously, Defendant was only able to access Bloomberg data via their highly-restricted Bloomberg Developer's license.

54.     This void in Defendant's functional capabilities is precisely one of the reasons that Plaintiff designed and developed its internal capabilities and corresponding Trade Secrets prior to hiring the Defendant in a project "Development Support" capacity (supported by the Development Support contract identified within the Statement of Work document). It is vital to understand that according to the contracts between the Plaintiffs and Defendant, *all work product and corresponding Trade Secrets are the sole intellectual property of Cent*, which is under no obligation to provide rights for Defendant's use or distribution.

55.     The code packages associated with *"BloombergLink"* and the prior "limited" version of *ServiceConnect["BloombergTerminal"]* allows some data to

be pulled daily but was not especially useful for most users in its intended role. Moreover, it possessed numerous technical bugs, some publicly documented by users in online forums, and Plaintiffs discovered and disclosed some to Defendant. Notably, Defendant's tutorial documentation states *"the maximum time resolution for "Historical" data is one day"* because Defendant could not or did not design its technology to fully interface with a Bloomberg Terminal or the data available via a Bloomberg Terminal Professional License (unlike Cent's fully functional Bloomberg Terminal Desktop API).

56. In the Webinar titled "Konieczny Decl Ex 9 - Aug 13, 2020, video," presented by Defendant to dispute Cent's claims, there exists specific language that substantiates Cent's claims. In the video, Dr. Kelly states, "*Here for instance, we set up a connection to the Terminal, and then I'm going to ask queries. Now the way that we do this in Mathematica, is that Mathematica has a sister program, that sits on top of it, that most probably heard of about, called WolframAlpha. So, WolframAlpha applies the functions in Mathematica to data in the real world, these are called Entities.*"

57. This limited functionality existed because Defendant developed its conventional infrastructure or connection software "*BloombergLink*" and *"ServiceConnect["BloombergTerminal"]"* based on utilizing WolframAlpha and a Wolfram-created Entity structure. Wolfram Finance Platform's tutorial

documentation specifically states, ""*BloombergLink" consist of two components-the "BloombergLink" Wolfram Language package and "BloombergLink" Adapter*." The functionality includes the Wolfram Symbolic Transfer Protocol (WSTP) technology with a Bloomberg Adaptor link object to establish what Defendant refers to as a hybrid connection to a Bloomberg Terminal.

58.     Defendant's conventional technology and language reads data out of a Bloomberg Terminal in a way that is inconsistent with the way Bloomberg delivers its data through the fully functional Bloomberg Desktop API connection (i.e. different naming conventions from the native elements of a Bloomberg Terminal). A fully functional connection to a Bloomberg Terminal feeds the data out via Nested Associations. This code structure and related functionality differs significantly from Defendant's conventional method which uses Wolfram Alpha and custom Entity structure  to organize the data in a flat structure. This arrangement is materially different than the actionable integration of the Nested Association data.

59.     A formal transformation protocol was developed by Cent in December 2020 and is directly associated with the reason it became necessary to develop "Handler" and "Helper" functions in order to properly format the data.  Without this transformation, the data streamed from a fully functional Desktop API is not usable in a meaningful way. In contrast, Defendant's conventional "hybrid" connection technology generates inconsistent linking to Bloomberg's established Field and

Property mnemonics (Bloomberg naming convention) which thereby creates unreliable data formatting, structuring, requesting, delivering, and reporting.

60.     The unreliable data obtained by the use of Defendant's conventional technology is in turn relied upon to potential detriment by investment firms, hedge funds, traders, and any entity with access to a Bloomberg Terminal Professional License. Dr. Kelly used "*BloombergLink*" (the alleged oldest and most deficient Bloomberg integration advertised by Defendant) much later as the capabilities benchmark during the development of Cent's fully functional Bloomberg Terminal Desktop API connection during the 2-day development cycle in December 2020.

61.     Wolfram Alpha and Wolfram Entities structure is used in the older "*BloombergLink*" technology, which at the computer language level is denoted as "*MarketDataConnect*" and "*MarketDataSources*" functionality which is constructed with the use of "*BloombergDesktopAPISource,*" "*LinkObject,*" and the "*BloombergAdaptor*" functions to connect with Bloomberg in a "hybrid" fashion. Notably, none of the functions are required for a fully functional connection. This is further established in the Webinar titled "*Konieczny Decl Ex 9 - Aug 13, 2020, video*".. In the video, Dr. Kelly states, "*But if you have the **Finance Platform** then you can get connections to Bloomberg and Reuters, and then get all their data there. As I showed that there are tens of thousands of those, **they are connected to WolframAlpha**. WolframAlpha is our very high language, natural language*

processing function, and we did this before there were AIs, before there were neural networks and everything, using statistical analysis and our own statistical tools. **Now we use a hybrid version, a connection of both**, because our language is so highly structured.*"

62.     In contrast to Defendant's conventional technology, Cent's infrastructure, architecture, and algorithm & analysis components Trade Secret technologies use different, "new", and novel back-end code partially identified by the ("*ServiceConnect*") function to connect "fully" to an actionable Bloomberg Terminal Desktop API for accessing all native elements from the Bloomberg Terminal holistic data feed and their corresponding data structure (i.e. Nested Associations). The reason for the description of the aforementioned *"ServiceConnect"* function being described as "partially identified" is because Defendant claims, as of 2019, that Defendant had already developed and made public a fully functional Bloomberg Desktop API connection which is formally presented and identified as *"ServiceConnect["BloombergTerminal"]"*.

63.     However, within the "Milestones and Tasks" section of the Estimate of Services Quote document, the second work item requirement contracted is to develop a "function to allow for the streaming of data." This requirement defines the literal and practical definition of the *ServiceConnect["BloombergTerminal"]* code functionality and gives rise to foundational questions to the Defendant's claims of

possessing such a capability in 2019 that would still require the Defendant to contract its developmental work to a client under terms of a "Development Support" contract.

64.     Plaintiff believes and therefore avers that this Bloomberg Terminal API connection was non-functional. Recordings from Dr. Kelly after the January webinar reflect the unactionable functionality of the alleged Bloomberg Terminal API connection and usage – mainly developed by Stephen Wolfram and Fahim Chandurwala - uses Defendant's developed custom entity structure that, in Dr. Kelly's words, *"doesn't work for some damn reason"* and was *"part of the reason for using [Cent's] Bloomberg Terminal."* Dr. Kelly goes on to say that this technical quandary is *"embarrassing"* and *"causing undue stress for people like yourself who want to use the [Bloomberg Terminal] full capabilities."*

65.     Before the January 27, 2021 webinar, Dr. Kelly stated while referencing the publicly available documentation associated with the alleged claim to capability released in Mathematica Version 12 and corresponding version of Wolfram Finance Platform (2019), *"When we go into Mathematica and ask for the Bloomberg Terminal, then, you know, we get this really shitty page that I can never apologize enough for. Um, but most of which is not very helpful at all."*

66.     Dr. Kelly, in recordings provided to Cent by Defendant after the January 27, 2021 webinar, provides further support for Cent's claims to the Trade

Secrets found in Averment 1 of above (i.e., *"development of a fully functional API connection that enables the integration and transformation of Bloomberg LP's native elements, which are associated with all Fields and Properties within the Bloomberg namespace, thereby making them not only discoverable, but actionable"*).

67.    Dr. Kelly's comments support Plaintiffs' statements in Averment 28 on the Defendant's capabilities (i.e. *"substantiates questions as to the Defendant's ability to legitimately obtain the rights to develop and distribute a fully functional Bloomberg Terminal Desktop API integration with their "current", "highly-restricted" Bloomberg Developer's license"*) being *"limited"* to say the least. Dr. Kelly states that ***"We've had a hitch with Bloomberg, of course. I was using the Developer's version of our Bloomberg Terminal, and then you gave me yours because it's so much easier to basically, just actually, go into the Terminal, make queries - stuff like that. Which I couldn't do with our Developer version, because we had a very cut-down, cheap version."*** Dr. Kelly goes on to ask: *"I was wondering if we could get another copy [Bloomberg Terminal and License]?"*.

68.    Cent's project and Trade Secret and confidential information was vital for the actionable utilization of all data corresponding to the fully functional Bloomberg Terminal Desktop API, since Defendant did not have a Bloomberg Terminal License, which integrates all native elements of a fully functional

Bloomberg Terminal Desktop API before Cent provided it to Defendant. Thus, without the Plaintiffs' resources and the Plaintiffs' Trade Secrets and confidential information, the fully functional integration to the Bloomberg Terminal Desktop API would not have been possible.

69. Cent developed the infrastructure components and the architecture components using internal, functional programming language, including computer source code, which are then part of Cent's overall Trade Secrets. Further, Cent also identified the significant code limitations of the conventional *"BloombergLink"* technology and *"ServiceConnect["BloombergTerminal"]"* technology claimed before Cent interacted with Defendant. This information has commercial value from a negative viewpoint and constitutes a Trade Secret, in that Cent was able to demonstrate, after expending significant time and resources, that the conventional *"BloombergLink"* technology was not capable of pulling Bloomberg data in concurrent sessions in continuous real- time (simply meaning one could only analyze one stock at a time).[2] This limitation required the development of a new and improved fully functional API connection which was substantially derived from Plaintiffs' Trade Secret and confidential information. Therefore, the aforesaid API connection could not have been created or developed without the use of Plaintiffs'

---

[2] The commentary to the Uniform Trade Secrets Act indicates that information which has commercial value from a negative viewpoint may be a trade secret.

Trade Secret and confidential information. Cent's identification of the code limitations of the conventional *"BloombergLink"* and *"ServiceConnect["BloombergTerminal"]"* technologies were also of significant value to Defendant, in that Cent was able to save Defendant significant time and money in developing the aforesaid fully functional Desktop API connection.

70.     The infrastructure components used by Defendant under contract formed the structural basis for a fully functional Bloomberg Terminal Desktop API connection with the Wolfram Finance Platform, thus allowing for full mnemonic identification (i.e. Bloomberg Terminal namespace elements), representation, integration, and reliable concurrent sessions.

71.     The architectural components include, but are not limited to, a formal transformation mechanism along with a novel computational kernel architecture that is unique in design.  It implements an asynchronous parallel computation and data processing method to be deployed in an on-premises Enterprise Private Cloud (EPC) environment, allowing hardware integration, utilization, and optimization in a propriety distributed computation network.

72.     Plaintiffs partially converted the infrastructure components and the architecture components into Wolfram's language using licensed software to allow Cent's proprietary platform to interface properly with a Bloomberg Terminal

Desktop API and data system. However, additional work was needed and partially provided by Defendant under "Development Support" contract.

73.     The completed converted infrastructure components are referred to as Product One (1).

74.     The completed converted architecture components are referred to as Product Two (2).

75.     The completed converted algorithm & analysis components are referred to as Product Three (3).

## A. Chronology

76.     In the year 2020, Plaintiff Cent Holding approached Defendant to complete development of a "new" fully functional service connection and Bloomberg Terminal integration including back-end API, using the Wolfram language, based on Cent's Trade Secret information so Cent could receive specific and comprehensive data from a Bloomberg Terminal to launch its hedge fund business utilizing its proprietary never before used Tabula Rasa process garnering vastly greater data from Bloomberg at a greatly accelerated rate to make highly informed trading decisions.

77.     In April 2020, Plaintiff Cent Holding began using the Wolfram language through free trials. Plaintiff Cent Holding began using the Wolfram language to implement Tabula Rasa in an integrated development environment.

Plaintiff Cent Holding spent months converting over 4,000 documents and files into Wolfram language, to create a fully integrated software and documentation architecture that is an industry first. Using the Wolfram language with Tabula Rasa allows for:

> a. Radical technological breakthroughs.
>
> b. Complex systems integration.
>
> c. Incremental improvement and iteration of subject matter domains.
>
> d. Creation of sound modeling and validation process (explainable decisions), and
>
> e. All of the above can be achieved while maintaining compliance with applicable governance policies and procedures.

78. In so doing, Plaintiff Cent Holding substantially developed a way to integrate the Wolfram language with the full breadth of native elements associated with a Bloomberg Terminal and its corresponding Desktop API, which no one has ever been able to accomplish before within the Wolfram Language.

79. In September 2020, Plaintiff Cent Holding purchased a license from Defendant for use of the Wolfram language for concurrent users.

80. In November 2020, Plaintiff Cent Holding began discussions with high-level Wolfram personnel about hiring Defendant for technical consulting related to full integration of Cent's infrastructure components and architecture components

into the Wolfram Language as a basis for developing the "new" fully functional Desktop API. The discussions additionally included converting Cent's critical Trade Secret algorithm & analysis components into the Wolfram Language.

81.     As part of the project plan provided by Cent to Defendant, Cent developed new code and requirements which became part of Cent's Trade Secrets and proprietary information. On November 27, 2020, and December 3, 2020, Cent provided Defendant with this proprietary intellectual property, including Trade Secret code, through email in anticipation of meetings and discussions with Defendant.

82.     As part of engaging Defendant toward the end of 2020, Plaintiffs and Defendant agreed on a non-disclosure agreement (the "NDA") with an effective date of December 4, 2020, to protect the confidential and proprietary nature of Plaintiff Cent Holding's technical information, processes, formulae, intellectual property, etc. Under the terms of the NDA, Defendant agreed that it would protect Plaintiff Cent Holding's Confidential Information, not disclosing it to anyone other than those within Defendant with a "need to know," and only after any such recipient signed a similar NDA. The NDA provides that Defendant did not obtain any rights in the Confidential Information, other than to carry out the purposes of the parties' engagement. Term 3 of the NDA indicates, "All technical information, business plans, and pricing information shall be confidential information." Furthermore, this

means that all content from Cent's contracted project plans, documents, and all related technical conversations and development should have been protected including Cent's novel computational kernel architecture.

83.     In December 2020, Plaintiff Cent Holding and Defendant agreed on a scope of work for "Technical Consulting Development Support" (Contract # 2020043, the "Consulting Contract"). The purpose of the Consulting Contract was to engage Defendant to help Plaintiff Cent Holdings fine tune and complete various aspects of Plaintiffs' proprietary platform for access to the Bloomberg Terminal, including the development of a "new" or improved fully functional Desktop API and help convert Plaintiffs' Trade Secret and confidential information into the Wolfram Language. Plaintiff prepaid $10,000 to Defendant, against which Defendant would begin billing hourly for its services. The Director for Technical Consulting for all of Wolfram Research, Anshu Manik, and the individual who produced the Estimate of Services document built from the milestones/tasks Cent gave to their consulting team on November 27, 2020, and December 3, 2020, as well as all subsequent project meetings. In a talk that Anshu gave on May 25, 2021, at the Wolfram Technology Conference, Anshu substantiates the conversations that Cent had with Defendant when establishing who would be responsible for the Design and Development of Cent's new technology.

84.     Under the Consulting Contract, Defendant agreed to provide technical consulting developmental support under the basis that Cent was the Designer and Developer of the technologies and Defendant was there to complete work as tasked, in multiple phases, beginning on December 4, 2020. In the Consulting Contract, Defendant agreed to protect the confidentiality of Plaintiff Cent Holding's materials.

85.     Plaintiff Cent Holding purchased additional Wolfram products for $46,800 and was billed $18,400 for consulting work for the first phase of work and the additional phases to follow.

86.     In the first phase of work under the Consulting Contract, Defendant was to provide the following to Plaintiff Cent Holding:

**Estimate of Services**

**Milestones / Tasks**

Backend codes:

  Functions to obtain 14 different fields for Calls and Puts

  Function to allow for streaming of data

  Packaging and Testing backend code

Frontend codes and Deployment:

  Creating GUI Wireframe

  Writing function to set up connection to bloomberg link

  Function to display real time Tick data and Volume level

  Popup menus for Real-Time Options (from BID Size, ASK Size etc.)

  Capability to show next 2-14 in Grid subplot corresponding to the strike price

  Writing function to allow ability to select the bar interval for the subscription

  Ability to group those bars in a specific number of groups

  Real time Plot ,Historical Plot and switching options between different plots and subplots

  Additional factors needed to be accessible: Volume, Volume ($USD), VWAP, Change, Change %, LAST, LAST_SIZE

  Connecting to backend function

| Milestones / Tasks |
| --- |
| Packaging and Deployment |
| Testing(Final GUI) |

87.     As part of the engagement of Defendant, Plaintiff Cent Holding agreed to obtain a Bloomberg Terminal for Defendant's permissive use, but Defendant could only use that Bloomberg Terminal for Cent's contractual needs.  Purchasing this terminal was a significant additional expense to Plaintiff Cent Holding.  Prior to this engagement, upon information and belief, Defendant did not have access to a Bloomberg Terminal, or a Bloomberg Terminal Professional License for data, and Bloomberg would not have allowed Defendant access under Bloomberg's policies. Had Defendant been able to purchase a Bloomberg Terminal License(s), then presumably, Dr. Kelly would not have experienced a *"hitch with Bloomberg"* and Dr. Kelly would have been able to acquire a terminal for the front-end developer in India (Gaurav), providing access to live market data and the corresponding, "newly" developed, connection to a Bloomberg Terminal and fully functional Desktop API. This information is important because Dr. Kelly had to repackage the code disclosed in the January 27, 2021, Webinar (and additional code from the project) so Gaurav could attempt to integrate trading charts along with dynamic visualizations into Cent's custom Dashboard. This attempt failed, and is representative of the differences in the license, data structures, and downstream analysis and integration.

Further, it shows that all downstream development is materially affected by the first-order effects of data infrastructure and architecture supplied by the "new" connection to the Bloomberg Terminal and fully functional Desktop API. These actions demonstrate how vital a proper integration is to systematic data transformation and distribution throughout the Wolfram Language. Notably, to quote Dr. Kelly from an email on February 25, 2021, stating, "*I am going to have to move this meeting till tomorrow afternoon, say 3pm, because I am having some difficulties with the GUI interface that I need to resolve before I meet you both. Sorry for the delay but it is better that I work on this now so I can meet again with my Indian colleague who is in a different time zone.*"

88.     On or about December 21, 2020, Defendant met with Bloomberg in an onboarding process to install Cent's Bloomberg Terminal account on the contracted developer's computer. The only way to call data from a Bloomberg Terminal is for the user to scan their fingerprint for authentication. Upon authentication, the data may only be streamed to another application installed on the user's physical device. Meaning, without the formal installation of a Bloomberg Terminal by Bloomberg personnel in a scheduled meeting, a user cannot access the Desktop API or the nested associations of data that can stream from it. Additionally, the file directories included under the "blp" folder in the Operating System C Drive, validates installation, and is the sole source required to write and test the back-end code needed for the "new"

fully functional API connection to this folder. Significantly, Defendant attempted to retrofit its existing code, packages, and mnemonics from *"BloombergLink"*, which was part of the underperforming Wolfram Finance Platform, to provide the "new" fully functional connection requested by Cent under contract ("Function to allow streaming of data" from Estimate of Services document). Defendant's efforts to use its own method from its confusingly named *"BloombergLink"* failed completely. *"BloombergLink"* simply did not work.

89. Plaintiffs needed their new fully functional connection to the Bloomberg Terminal to function properly. As part of Plaintiffs' engagement of Defendant, and subject to the terms of the previously agreed upon non-disclosure agreement (as well as applicable Trade Secret law), Plaintiffs allowed Defendant to gain access to Plaintiff Cent Holding's confidential and proprietary company information, including its Trade Secrets. Among the Trade Secret and confidential information Plaintiffs provided to Defendant was included Plaintiff Cent Holding's code structure and method of integration with a Bloomberg Terminal to solve the problem Defendant had because *"BloombergLink"* and the prior version of *"ServiceConnect["BloombergTerminal"]"* released in 2019 would not work. The secrets given under the non-disclosure agreement by Plaintiffs to Defendant, allowing Defendant to correctly connect to the fully functional Bloomberg Terminal Desktop API, solved these issues. Prior to Cent's giving of these proprietary

methods to Defendant under the NDA to facilitate Plaintiffs' and Defendant's contractual working relationship, no one had public possession of these proprietary methods and information other than Plaintiff Cent Holding. Plaintiffs trusted Defendant to keep this information secret under the NDA, and in the belief that Plaintiffs and Defendant were contracting partners.

90. Defendant had its own functions to connect to various databases and service providers (i.e. *FinancialData[]* referenced in Paragraph 7). The software included Defendant's own versions of various downstream functions including widely used ones related to portfolio construction and optimization such as quadratic optimization, second-order cone optimization, conic optimization, linear fractional optimization and linear optimization However, prior to Cent, these functions, and all other pre-built Wolfram functions, were never modified or applied to the data corresponding to the "new" connection to a fully functional Bloomberg Terminal Desktop API. When Cent provided Defendant with access to a Bloomberg Terminal, thereby creating a novel API connection (i.e. integration), the use of all functions Defendant claims to have already developed and documented were/are rendered useless. The construction of "Handler Functions" and "Helper Functions" were/are *"Necessary"* and required to structure (i.e. transformation) the nested associations of data in a manner that any and all logical or mathematical downstream analysis can read or process (i.e. deploy). Stated more clearly, Plaintiffs allege any function

that touches data streaming from a Bloomberg Terminal constitutes Trade Secrets of Cent, because without the data, and the *"Necessary"* changes to the data formatting and function(s) integration, all prior functions are *de facto* useless and cannot render a usable result.

91.     In a two-day development cycle as reflected in the December 29, 2020 and December 31, 2020, email correspondence between Defendant and Cent, Dr. Kelly addressed the need to develop an entirely new and fully functional API, which was better than the one presently utilized by Defendant, using the Trade Secret and confidential information provided by Cent. The discussion from the December 29, 2020, email correspondence indicated Defendant's developer knew it was *"Necessary"* to make the functional changes stated above. Dr. Kelly stated **"*[s]ince BT [Bloomberg Terminal] returns Nested Associations it becomes necessary to build helper functions to transform the BT data into TimeSeries objects that can be analyzed using TS operators and visualized inside TradingCharts.*"** The email also indicates the importance of these changes **"*when constructing portfolios,*"** and that the associated changes **"*allow for standardization and easy insertion into the TradingChart.*"**

92.     In the December 29, 2020, and December 31, 2020, email correspondence, Dr. Kelly of Defendant emphasized the benefit of being able to have a Bloomberg Terminal which was paid for by Cent as part of Cent's contract with

Defendant to develop an optimized, fully functional API technology exclusively for Cent. This is Cent intellectual property created under contract with Defendant. By its admission, Defendant acknowledged the deficiencies in its own system identified by Plaintiffs, and its need of Plaintiffs' assistance to overcome those deficiencies. This information has significant economic value as Defendant integrated it into its financial platform and utilized it in its subsequent webinars, related notebooks, and related marketing information without consulting or approval from Cent the "owner" of the intellectual property created under contract that Defendant disseminated. In fact, Defendant copied the code developed during the parties' contractual relationship to implement Cent's intellectual property from Cent's Notebook and incorporated it directly in Defendant's own Notebook without attribution, passing the copied code off, publicly, as having been created by Defendant exclusively. This is confirmed by the fact that CellIDs (569487219, 339776170, and 656790774) are common between Cent's private Notebook and Defendant's public Notebook.

93.    Defendant produced a webinar on January 27, 2021, a second webinar on May 13, 2021, and a third webinar on July 1, 2021, that Dr. Kelly states were all a part of a complementary series.

94.    In late January 2021, without Plaintiffs' consent or permission, Defendant hosted the first online webinar for more than 400 hedge-fund industry professionals. Under this webinar, Defendant provided the 400 participants access

to Cent's infrastructure components and the architecture components as well as some aspects of Cent's algorithm & analysis configuration components in violation of the NDA, the Consulting Contract, and the Technical Statement of Work ("SOW").

95.     **The code that was disclosed by Defendant to the attendees in the January 27th, 2021, webinar EXACTLY matches Cent's proprietary code provided to Defendant by Cent.** In the January 2021 webinar, Defendant used Plaintiffs' Bloomberg Terminal and project code to demonstrate and pitch (for sale) a new product. Defendant falsely claimed to the attendees that this new product was created by Defendant.  That new product includes the ability to fully integrate the Wolfram language with a Bloomberg Terminal, the precise product Cent contracted with Defendant to create. Defendant even provided a free download of the product, in essence providing the integration (created under its contract with Cent) to the entire industry of Cent's competitors for free upfront because Defendant could thereafter charge each user a hefty annual license fee for using the Wolfram language product created under contract with and for Cent on the back end.

96.     The downloaded product consisted of Plaintiffs' infrastructure components and the architecture components that Plaintiffs gave to Defendant to assist Defendant in repairing the deficiencies pre-existing, before Cent came along, in Defendant's "*BloombergLink*" and Defendant's prior version of the "*ServiceConnection["BloombergTerminal"]*".

97.     Cent provided Defendant with the necessary connection so that Defendant could connect a Cent-supplied Bloomberg Terminal to allow Defendant to fulfill its obligations to Plaintiffs under the parties' contract. Defendant took the infrastructure and the architecture components provided by Cent, using Cent's proprietary ideas, to form the "new" fully functional Desktop API and the use cases thereof. Defendant disseminated this "new" product as its own knowing it could command licensing fees from webinar attendees who decided to use the product in their respective businesses. Defendant could be certain nearly everyone in the industry would want access to it. But Defendant would not have had these pieces except that its "*BloombergLink*" and Defendant's prior version of the "*ServiceConnection["BloombergTerminal"]*" failed to do what Plaintiffs needed it to do under the parties' contract, thereby compelling Plaintiffs to give their proprietary information to Defendant as a workaround to the two non-functioning integrations/connections listed above.

98.     Plaintiffs' proprietary infrastructure components and the architecture components worked so well in solving Defendant's issue in connecting to the Bloomberg Terminal, that Defendant took those ideas and packaged them as its own. Defendant further gave them out to the hedge fund professionals around the world on the promise of future revenue to come when these professionals recognized the enormous potential of Plaintiffs' ideas.

99. By providing access to Cent's Trade Secrets, including the infrastructure components and the architecture components, the 400 participants could now access about 63,600 pieces of Bloomberg's Fields and Properties data points in actual, concurrent, and continuous real-time, which was not available to them (or Defendant until it contracted with Cent) previously.

100. By providing access to Cent's Trade Secrets, including the infrastructure components and the architecture components, this unauthorized disclosure by Defendant now provides a technical vehicle for these participants to apply and develop their own algorithm components possibly competing with Cent's analysis components, including Cent's proprietary algorithms, thereby causing non-quantifiable irreparable harm to Plaintiffs. This potential competitive activity is in addition to Defendant already directly competing with Plaintiffs. Defendant is using the "new" fully functional Desktop API, which is the intellectual property of Cent, and improperly disclosing information regarding the same to direct competitors of Plaintiffs.

101. Defendant, knowing of the present litigation, had a second webinar on May 13, 2021, the advertising for which included promoting portfolio optimization functions, including quadratic, conic, second-order cone and linear fractional methods, which were in actuality modified and developed by Cent and were provided to Defendant as part of the Consulting Contract *See* **Exhibits 3 and 4**

**attached hereto**. Cent designed the proprietary implementation and application of their use in a constraint-neutral portfolio management philosophy used in Cent Capital's Optimal Telemetry model strategy found in Cent Capital's form ADV Part 2, on file with the SEC). Additionally, they were not previously implemented on top of Bloomberg Terminal data, meaning a person needed stock data to construct portfolios and then optimize them. By advertising their use with Bloomberg Terminal data, Defendant is claiming it developed the aforesaid optimization functions prior to Cent's project, which is untrue. In fact, Cent partially developed them and made additional improvements which were disclosed to Defendant as part of the Consulting Contract between the two. This is clearly and concisely substantiated, along with the full credit for the development of Bloomberg Terminal capabilities, in an email to Cent from Dr. Kelly on December 31, 2020.

102. With the webinar publications, Defendant marketed Cent's Trade Secret information as its own, violated the non-disclosure agreement, violated the confidence reposed in it by Plaintiffs, violated applicable Trade Secrets statutes, and harmed Plaintiffs' competitive advantage.

103. Defendants' conduct has caused tremendous damage to Plaintiffs, and the risk of further damage is imminent. Defendant has benefited by saving millions of dollars in development costs to produce an effective and new fully functional Desktop API connection to a Bloomberg Terminal by effectively stealing Cent's

work gained when Defendant contracted for Cent and Cent in good faith granted Defendant access to its sensitive and secret ideas.

## Count 1
## Breach of Contract (NDA)

104.   Plaintiffs adopt and incorporate the allegations in the preceding 103 paragraphs as if set forth fully herein.

105.   At the time of engagement of Defendant in early December 2020, Plaintiff Cent Holding and Defendant entered into the NDA.

106.   The NDA provides, *inter alia*, that Defendant is obligated to protect Plaintiff Cent Holding's Confidential Information, not disclosing it to anyone other than those at Defendant with a "need to know" and only after such recipient signed a similar NDA. The NDA specifically stated without ambiguity that under the contracts, Defendant did not gain any rights to Cent's Confidential Information, other than that necessary to carry out the purposes of the parties' engagement.

107.   Under the terms of the NDA, Defendant acknowledged and agreed that damages cause by Defendant's improper disclosure of Confidential Information may be irreparable and may not be satisfied in monetary damages. Accordingly, in the NDA, Defendant agreed that Plaintiff Cent Holding has the right, in addition to all other rights, to seek and obtain injunctive relief for any violation of the NDA.

108.   The NDA is a contract between Plaintiff Cent Holding and Defendant.

109.   Plaintiff Cent Capital is a third-party beneficiary of the NDA.

110. Through the conduct described herein, Defendant has breached the NDA and caused substantial and irreparable harm to Plaintiffs.

111. Furthermore, Plaintiffs continue to be at risk of additional imminent and irreparable harm, as Defendant continues to possess Plaintiffs' information that is subject to the NDA. Nonetheless, Defendant has shown that it has no regard for the restrictions of the NDA and will breach it with impunity even knowing this litigation is in process.

**WHEREFORE**, Plaintiff's demand judgment for compensatory damages for such damages as can reasonably be ascertained, plus interest, costs, and attorney fees, plus injunctive relief to protect Plaintiffs from otherwise irreparable harm.

## Count 2
## Breach of Contract (Consulting Contract)

112. Plaintiffs adopt and incorporate the allegations paragraphs 1 through 103 as if set forth fully herein.

113. In December 2020, Plaintiff Cent Holding and Defendant agreed on a scope of work for "Technical Consulting Development Support" (Contract # 2020043, the "Consulting Contract"). The purpose of the Consulting Contract was to engage Defendant to help Plaintiff Cent Holdings fine tune and complete various aspects of Plaintiffs' proprietary platform. Plaintiff prepaid $10,000 to Defendant, against which Defendant would begin billing hourly for its services.

114.   Cent contracted with Defendant to finalize the conversion of the infrastructure components and the architecture components into the Wolfram Language and designed and directed the development of a "new" fully functional Desktop API connection to a Bloomberg Terminal, which cannot be replicated without breach of Cent's NDA. The Consulting Contract included the Technical SOW, which had deliverable dates set forth therein.

115.   Under the Consulting Contract, Defendant agreed to provide technical consulting developmental "support", in multiple phases, beginning on December 4, 2020. In the Consulting Contract, Defendant agreed to protect the confidentiality of Plaintiff Cent Holding's materials.

116.   Defendant's deliverable work (the "milestones/tasks") under the Consulting Contract has been slower than anticipated, and now Defendant has ceased (or appears to have ceased) performing any meaningful work at all.

117.   On December 29, 2020, Defendant provided Cent a detailed email outlining a recent 145-minute meeting of topics covered, including features or functions which were *"Necessary"* to connect to the "new" fully functional Bloomberg Terminal Desktop API to optimize the functionality of the same. Some of these features or functions include code for comparing different equity Open, High, Low, Close, Volume Information time series as well as modifications of *TimeSeries* objects using operators such as *TimeSeriesMap*, *TimeSeriesMapThread*

and *TimeSeriesAggregate*. Dr. Kelly's email corroborates Cent's claims that this is an entirely new technology and clearly displays the sheer volume of differences in "*BloombergLink*" and the Bloomberg Terminal Integration. Defendant claims it had this capability prior to Cent, on or around April of 2019. That cannot be true since extensive modifications were *"Necessary"* to call market data from the "new" fully functional connection with the Bloomberg Terminal and Desktop API in order for the process to function as intended. Additionally, Defendant has not provided proof of a Bloomberg Terminal License agreement on or before the "Alleged" release date of this capability in 2019.

118. Defendant never delivered a completed version of the first phase of the deliverables under the Consulting Contract/Technical SOW. Additionally, screen recordings of Zoom development work sessions between Dr. Kelly and Cent personnel suggest that Dr. Kelly used Cent's Bloomberg Terminal to conduct at least five hours of consulting work for Cent's competitors. As a result, Cent experienced undue delays in their project caused by not only the webinar, but Defendant's intent to use Cent's resources outside the contracted project without Cent's prior approval.

119. Defendant has breached the Consulting Contract by (1) failing to protect Plaintiffs' confidential information, (2) failing to deliver the "milestones/tasks" as agreed, and (3) ceasing to perform work.

120. Defendant's breach of the Consulting Contract has caused damages and irreparable harm to Plaintiffs.

**WHEREFORE**, Plaintiff's demand judgment for compensatory damages for such damages as can reasonably be ascertained, plus specific performance of Defendant's promised work, plus interest, costs, and attorney fees, plus injunctive relief to protect Plaintiffs from otherwise irreparable harm.

## Count 3
## Trade Secrets Act

121. Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 103 as if set forth fully herein.

122. Plaintiffs' tool known as Tabula Rasa and Plaintiffs' process for implementing Tabula Rasa on a Bloomberg Terminal with the Wolfram language are "Trade Secrets" within the meaning of the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 et seq., and the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.

123. Plaintiffs are the "owners" of said Trade Secrets as defined by the Defend Trade Secrets Act of 2016, 18 U.S.C. §§1836 et seq.

124. Plaintiffs are "persons" as defined by the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.

125. At all times, Plaintiffs have taken all reasonable steps and measures to protect the confidentiality of these Trade Secrets and keep such information secret.

126. Plaintiffs' Trade Secrets derive independent economic value, both actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of Plaintiffs' Trade Secrets.

127. Plaintiffs provided access to these Trade Secrets to Defendant in confidence, with the reasonable belief and expectation, as Defendant knew, that Defendant would use such access only for Plaintiffs' benefit and not for the benefit of Defendant or any other party.

128. Defendant misappropriated Plaintiffs' Trade Secrets and used those Trade Secrets in Defendant's business by disclosing the same without express or implied consent from Plaintiffs while knowing, or having reason to know, that knowledge of the Trade Secrets was acquired under circumstances which gave rise to a duty to maintain the secrecy of the Trade Secrets or limit the use of the Trade Secrets.

129. Defendant further misappropriated Plaintiffs' Trade Secrets and used Plaintiffs' Trade Secrets, or a substantial portion thereof, to create improvements and/or modifications to Defendant's software or other products which were substantially derived from Plaintiffs' Trade Secrets. More specifically, Defendant misappropriated Plaintiffs' Trade Secrets in order to resolve its own technical deficiencies related to its use of outdated code and technology in its existing line of

financial products and create a "new" fully functional Desktop API connection to a Bloomberg Terminal for use with updated version(s) of its line of financial products.

130.   Without Plaintiffs' consent, Defendant took these Trade Secrets for Defendant's benefit, and to the harm of Plaintiffs. Defendant published these Trade Secrets through at least one webinar, making them known and available to the entire hedge-fund industry.

131.   Defendant stood to gain from this, while Plaintiffs suffered and continues to suffer substantial and irreparable harm.

132.   Defendant's actions as described herein were a violation of the applicable Trade Secrets statutes set forth hereinabove.

133.   Defendant's actions, including but not limited to releasing Cent's Trade Secret computer code imbedded in the infrastructure components and architecture components during the aforesaid webinars, as well as the resultant "new" fully functional Desktop API connection developed under direction and funding by Cent, have been willful and malicious and violate at least the NDA and SOW.

134.   Defendant has caused substantial and irreparable harm to Plaintiffs.

135.   Furthermore, Plaintiffs continue to be at risk of additional imminent and irreparable harm, for Defendant continues to possess Plaintiffs' Trade Secrets, yet Defendant has shown that it has no regard for the protection of Plaintiffs' Trade Secrets and will violate Plaintiffs' rights with impunity.

**WHEREFORE**, Plaintiffs demand judgment for compensatory damages for such damages as can reasonably be ascertained, damages for the actual loss caused by the misappropriation of Plaintiffs' Trade Secrets, damages for Defendant's unjust enrichment loss caused by the misappropriation of Plaintiffs' Trade Secrets, a constructive trust over Defendant's earnings from the Trade Secrets, plus interest, costs, attorney fees, punitive damages, exemplary damages and statutory damages, plus injunctive relief to protect Plaintiffs from otherwise irreparable harm.

## Jury Demand

Plaintiffs demand trial by struck jury on all issues so triable.

Respectfully submitted,

Date: July 26, 2021       */s/ Michael T. van der Veen, /s/ Bruce L. Castor, Jr.*
Michael T. van der Veen & Bruce L. Castor, Jr.
van der Veen, Hartshorn and Levin
Pennsylvania Bar ID #: 75616/46370
1219 Spruce Street,
Philadelphia, PA 19107
Email: mtv@mtvlaw.com, bcastor@mtvlaw.com
P: (215)-546-1000
F: (215)-546-8529
Attorneys for Plaintiffs

Date: July 26, 2021       */s/ J. Thomas Richie*
J. Thomas Richie
Carson S. Phillips
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
P: (205) 521-8000
F: (205) 521-8800

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Floyd D. Gaines
> Daniel B. Snyder
> GAINES LLC
> 2160 Highland Avenue South, Suite 101
> Birmingham, AL 35205
>
> Bradford P. Lyerla
> Daniel I. Konieczny
> Katherine O'Brien
> Amie M. Bauer
> TABET DIVITO ROTHSTEIN LLC
> 209 South LaSalle St., 7th flr
> Chicago, IL 60604

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

> None

*s/J. Thomas Richie*
J. Thomas Richie

BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
E-mail: trichie@bradley.com

# APPENDIX A

## GLOSSARY TO THE AMENDED COMPLAINT

1. **API Feed/Connection** – API is the acronym for Application Programming Interface, which is a software intermediary that allows two applications to talk to each other. Each time you use an app like Facebook, send an instant message, or check the weather on your phone, you are using an API.

2. **Asynchronous Parallel Computation and Data Processing Method** – Articulates a core capability of the proprietary kernel architecture described in the architectural components of the complaint.

3. **Back-end Code** – Code that runs on the server that receives requests from the clients and contains the logic to send the appropriate data back to the client.

4. **Bar Interval** – Bar charts consist of multiple price bars, with each bar illustrating how the price of an asset or security moved over a specified time period.

5. **Bloomberg Adaptor Link Object** – An established connection object used by Wolfram to attempt to bridge Wolfram to Bloomberg's namespace.

6. **Bloomberg Desktop API** – The Desktop API and Server API have the same programming interface and behave almost identically. The chief difference is that customer applications using the Server API have some additional responsibilities. Those additional requirements are detailed in Bloomberg's API documentation (found under Bloomberg API Developer' s Guide: Authorization and Permissioning); otherwise, assume the two deployments are identical.

   The Desktop API is used when the end-user application resides on the same machine as the installed BLOOMBERG PROFESSIONAL service and connects to the local

Bloomberg Communications Server (BBComm) to obtain data from the Bloomberg Data Center (see Figure 1-3).

*Note: Image below shows that Desktop API allows ALL Fields and Properties in Bloomberg's Global Platform (section 1.1.2) to be accessed on a Desktop End-User Application (GUI) i.e. Wolfram Finance Platform and is the product and technology Cent Developed a fully function Desktop API connection with.*



7. **Bloomberg's Platform Namespace** – The Bloomberg Platform is a revolutionary step in market data distribution—a new managed service that extends well beyond traditional industry solutions. Providing real-time, delayed, and historical market data, as well as global publishing, trusted entitlements, and much more, the Bloomberg Platform is a complete high-volume, low-latency service to end users, applications, and displays throughout your entire financial firm (see Figure 1-1).

*(Note: The Bullet Points in the image for the total platform match perfectly with Desktop API found at 1.1.4)*



Figure 1-1: The Bloomberg Platform

8. **BloombergLink** – Deficient Wolfram-to-Bloomberg bridged connection that required the Bloomberg Adaptor Link Object and Wolfram Symbolic Transfer Protocol (WSTP).

9. **"BLP" Folder** – Bloomberg software files installed upon download of Bloomberg Terminal Professional use License software application. This can only be done during a registered call with Bloomberg personnel.

10. **Computational Kernel** – In computing, a compute kernel is a routine compiled for high throughput accelerators (such as graphics processing units (GPUs), digital signal processors (DSPs) or field-programmable gate arrays (FPGAs)), separate from but used by a main program (typically running on a central processing unit). Compute kernels roughly correspond to inner loops when implementing algorithms in traditional languages (except there is no implied sequential operation), or to code passed to internal iterators.

11. **Congruent Sets** – In geometry, two figures or objects are congruent if they have the same shape and size, or if one has the same shape and size as the mirror image of the other.

12. **Conic Optimization** – Conic optimization allows for more general cones, that can express all the elements of a portfolio optimization problem, and much more. More formally, Conic optimization is a subfield of convex optimization that studies problems consisting of minimizing a convex function over the intersection of an affine subspace and a convex cone. The class of conic optimization problems includes some of the most well-known classes of convex optimization problems, namely linear and semidefinite programming. *(The example graphic below is a visual representation of the mathematical construct)*



13. **Convex Optimization** – Investment management professionals often use a framework for single-period optimization, where the trades in each period are found by solving a convex optimization problem that trades off expected return, risk, transaction cost and holding cost such as the borrowing cost for shorting assets. Then one can describe a multi-period version of the trading method, where optimization is used to plan a sequence of trades, with only the first one executed, using estimates of future quantities that are

unknown when the trades are chosen. More formally, convex optimization is a subfield of mathematical optimization that studies the problem of minimizing convex functions over convex sets. *(The example graphic below is a visual representation of the mathematical construct)*



14. **Data Type** – A particular kind of data item, as defined by the values it can take, the programming language used, or the operations that can be performed on it.

15. **Downstream Data** – The value C give that A + B = C.

16. **Enterprise Private Cloud (EPC) Environment** – Wolfram-provided product that Cent designed their distributed kernel networked system for computation targeting risk analysis, user management, etc.

17. **Entity Structure** – An entity is an object that exists. It doesn't have to do anything; it just has to exist. In database administration, an entity can be a single thing, person, place, or object. Wolfram has a defined custom entity structure associated with WolframAlpha.

18. **First-mover Advantages** – First movers can make their technology/product/services harder for later entrants to replicate. For example, if the first mover can reduce the costs of producing a product (an "experience" curve effect), the first mover can establish an absolute cost advantage. In addition, a the second benefit is the ability to control strategic and/or scarce resources. For example, Wal-Mart was able to locate its stores in small towns and prevent others from entering the market. Applying for patents can protect and

establish a first-mover advantage. The third benefit that first movers may enjoy is buyer switching costs. If the first business is able to establish itself firmly, it may be inconvenient for consumers to switch to a new brand later.

19. **First-Order Evaluation** – relating to the simplest or most fundamental level of organization, experience, or analysis; primary or immediate.

20. **Graphic User Interface (GUI)** – The Wolfram Finance Platform.

21. **Handler Functions** – A handler is a routine/function/method which is specialized in a certain type of data or focused on certain special tasks. Examples: Event handler - Receives and digests events and signals from the surrounding system (e.g. OS or GUI). Memory handler - Performs certain special tasks on memory.

22. **Helper Functions** – A helper function is a function that performs part of the computation of another function. Helper functions are used to make your programs easier to read by giving descriptive names to computations. They also let you reuse computations, just as with functions in general.

23. **Hyper-parameters** – In machine learning, a hyperparameter is a parameter whose value is used to control the learning process. By contrast, the values of other parameters are derived via training.

24. **Linear Fractional Optimization** – Linear fractional criterion is frequently encountered in business and economics such as: Min [debt-to-equity ratio], Max [return on investment], Min [Risk asset to Capital], Max [Actual capital to required capital] etc. More formally, in mathematical optimization, linear-fractional programming (LFP) is a generalization of linear programming (LP). Whereas the objective function in a linear program is a linear function, the objective function in a linear-fractional program is a

ratio of two linear functions. A linear program can be regarded as a special case of a linear-fractional program in which the denominator is the constant function one. *(The example graphic below is a visual representation of the mathematical construct)*



25. **Linear Optimization** – Financial institutions use linear programming to determine the mix of financial products they offer, or to schedule payments transferring funds between institutions. More formally, linear programming (LP, also called linear optimization) is a method to achieve the best outcome (such as maximum profit or lowest cost) in a mathematical model whose requirements are represented by linear relationships. Linear programming is a special case of mathematical programming (also known as mathematical optimization). *(The example graphic below is a visual representation of the mathematical construct)*



26. **Master Kernel** – A kernel is a central component of an operating system. It acts as an interface between the user applications and the hardware. The sole aim of the kernel is to manage the communication between the software (user level applications) and the hardware (CPU, disk memory, etc.). In Cent's proprietary platform Tabula Rasa, a Master Kernel is the manager kernel for number of computational kernels which report processed data for decision filtering.

27. **Meta-portfolio strategy** – An overarching strategy determining which other strategies to use in a given situation.

28. **Native Elements** – Bloomberg LP's predefined list of holistic Fields and Properties i.e., Namespace.

29. **Nested Association** (i.e., Data Type) – The nested type is a specialized version of the object data type that allows arrays of objects to be indexed in a way that they can be "queried independently" of each other.

30. **Novel Computational Kernel Architecture** – Cent's Proprietary system and process design that integrates the required aspects associated with software, hardware, and analysis processing into one unique distributed computational system that formalizes the

alchemy of transforming data into actionable decisions with Tabula Rasa. In essence, it is a novel integration between individualized data processing Kernels (solider decisions) and master Kernels in the centralized command structure (General decisions). This novel computational methodology represents the formal abstraction of Human used organizational hierarchies into a computer construct, which allows for distributed data analysis and decisions to be aggregated and consolidated for optimal situational awareness. This allows for "Group Think" and consensus by proxy. Which creates benefits of economies of scale and reduces the overall computational load- therefor time to decision.

31. **Operating System C Drive** – The C: drive, also known as your computer's hard drive, has the important job of storing your computer's operating system (Windows, Mac OS, Linux, etc.), as well as applications you use (e.g., Microsoft Office, Adobe, Mozilla Firefox) and files you download from the internet.

32. **Optimal Telemetry model strategy** – Cent Capital's "Optimal Telemetry" strategies are designed to implement the same risk modeling methodologies used in the TR Program for Active Strategies (i.e., Pure Signal) to a variety of longer term and more stable asset allocation models. Optimal Telemetry strategies are constructed in a manner that is deployable and scalable regardless of the size of their respective assets under management, at any given instance of time. Giving them greater flexibility with regards to market timing and liquidity risk factors than Active Strategies like Pure Signal.

33. **Parallel Implementation** – The parallel method of implementation involves operating both systems together for a period of time. This allows any major problems with the new

system to be encountered without the loss of data. Cent applies this logic it to computation in a proprietary and novel manner relating to portfolio optimization.

34. **Portfolio Optimization** – Portfolio optimization is the process of selecting the best portfolio (asset distribution), out of the set of all portfolios being considered.

35. **Quadratic Optimization** – Since the objective of minimizing portfolio risk is quadratic, and the constraints are linear, the resulting optimization problem is a quadratic program, or QP. More formally, quadratic programming (QP) is the process of solving certain mathematical optimization problems involving quadratic functions. Specifically, one seeks to optimize (minimize or maximize) a multivariate quadratic function subject to linear constraints on the variables. Quadratic programming is a type of nonlinear programming. *(The example graphic below is a visual representation of the mathematical construct)*



36. **Root or Compiling Languages** – A compiled language is a programming language whose implementations are typically compilers, and not interpreters. The term is somewhat vague. In principle, any language can be implemented with a compiler or with an interpreter.

37. **Second Order Cone Optimization** (SOCP) – SOCP provides powerful solution methods that extend the scope of portfolio optimization beyond the simple mean – variance utility function with linear and mixed integer constraints. By considering a number of economically important example problems, SOCP approaches allows investors to deal with some of the complexities of real-world investment problems. A great advantage in having efficient methods available to generate these solutions is that the investor's intuition can be tested and extended as the underlying utility or the investment constraints are varied. More formally, in a second-order cone program (SOCP) a linear function is minimized over the intersection of an affine set and the product of second-order (quadratic) cones. SOCPs are nonlinear convex problems that include linear and (convex) quadratic programs as special cases, and arise in many engineering problems, such as filter design, antenna array weight design, truss design, robust estimation, and problems involving friction (e.g., robot grasp). *(The example graphic below is a visual representation of the mathematical construct)*



Figure 1: Feasible region of an SOCP problem with three variables

38. **Snapshot**– A record of the contents of a storage location or data file at a given time.

39. **Sound Modeling** – Sound Decision-making. Taking the time to fully explore the options and possible outcomes of decisions, including discussions and reflections from others, makes for better and deeper decisions.

40. **Symbolic Mathematical Computation Programs** – In mathematics and computer science, computer algebra, symbolic mathematical computational programs, also called symbolic computation or algebraic computation, is a scientific area that refers to the study and development of algorithms and software for manipulating mathematical expressions and other mathematical objects.

41. **Technical Market Indicators** – Technical indicators are heuristic or pattern-based signals produced by the price, volume, and/or open interest of a security or contract used by traders who follow technical analysis. By analyzing historical data, technical analysts use indicators to predict future price movements.

42. **TimeSeries Objects** – TimeSeries represents a series of time-value pairs {ti,vi}.

43. **Time Resolution** – Refers to the discrete resolution of a measurement with respect to time i.e., the data streams in 1 second intervals or 30-minute intervals.

44. **Wolfram Symbolic Transfer Protocol** – Communicates code, data, and more between programs and is the native protocol for transferring Wolfram Language symbolic expressions between programs. WSTP allows programs written both in the Wolfram Language and other languages to exchange code, data or other symbolic expressions, with arbitrary structure.